UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DONNA RAGUS ORR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:05-CV-0634-G |
| PATAGONIA, INC. and LOST ARROW | ) | |
| CORPORATION, | ) | **ECF** |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a patent case. Before the court is the motion of the defendants,

Patagonia, Inc. ("Patagonia") and Lost Arrow Corporation ("Lost Arrow")

(collectively, "the defendants"), for a summary judgment of non-infringement. The

plaintiff, Donna Ragus Orr ("Orr" or "the plaintiff"), failed to properly[1] respond in

---

[1]     Orr styled her response to the defendants' motion for summary
judgment as both a response and a counter-motion for summary judgment. This
response and counter-motion was filed on May 5, 2006. The court, upon joint
motion of the parties, had previously issued an amended scheduling order that set a
March 27, 2006, deadline for filing dispositive motions. Amended Scheduling Order,

(continued...)

opposition to the defendants' motion for summary judgment.  For the reasons given below, the defendants' motion for a summary judgment of non-infringement is granted in part and denied in part.

## I. BACKGROUND

In this case, Orr asserts infringement of U.S. Patent No. 5,014,364 ("the '364 patent") by numerous Patagonia products.  Orr is an individual inventor who invented and patented a garment crotch structure.  In 1992, Orr sent a letter notifying Patagonia of the patent on her invention.  The letter included a copy of the patent summary, a prototype garment that she produced, and a series of drawings illustrating potential applications for her patented invention.  In response to Orr's letter, Patagonia sent a letter expressing thanks for her interest but informing her that Patagonia did not accept outside designs.  Several years later, Patagonia began producing a line of undergarments having an openable crotch structure similar to those in Orr's patented designs.

Because of this similarity, Orr brought this suit asserting infringement of the '364 patent by the Patagonia products on direct literal, direct equivalent, and inducement grounds.

---

[1](...continued)
filed January 30, 2006, ¶ 1.  Accordingly, the court ordered Orr's response and counter-motion for summary judgment stricken as untimely.  Order, filed May 9, 2006.  Orr subsequently failed to properly file any response to the defendants' motion for summary judgment.

## II.  ANALYSIS

### A.  Evidentiary Burdens on Summary Judgment

Summary judgment is proper when the pleadings and evidence before the court show that no genuine issue exists as to any material fact and that the moving parties are entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).[2]  The movants make such a showing by informing the court of the basis of their motion and by identifying the portions of the record which reveal there are no genuine material fact issues.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists.  FED. R. CIV. P. 56(c).

Once the movants make this showing, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.  To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt

---

[2]      The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*

*Corporation*, 475 U.S. 574, 586 (1986).  Instead, the nonmovant must show that the

evidence is sufficient to support a resolution of the factual issue in her favor.

*Anderson*, 477 U.S. at 249.

While all of the evidence must be viewed in a light most favorable to the

nonmovant, *id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59

(1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the

nonmovant's summary judgment burden.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288

F.3d 721, 725 (5th Cir. 2002) (citing *Little v. Liquid Air Corporation*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc)).  Summary judgment in favor of the movants is

proper if, after adequate time for discovery, the motion's opponent fails to establish

the existence of an element essential to her case and as to which she will bear the

burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

## B.  Patent Infringement Standards

Determination of patent infringement is a two-step process.  *Cybor Corporation*

*v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).  The first

step is for the court to determine the scope and meaning of the patent claims

asserted.  *Id.*  The second step involves a comparison of the properly construed claims

to the allegedly infringing device.  *Id.*  "To prove infringement, the patentee must

show that the accused device meets each claim limitation, either literally or under the

doctrine of equivalents." *Playtex Products, Inc. v. Procter & Gamble Company*, 400 F.3d

901, 906 (Fed. Cir. 2005).

1. *Claim Construction Standards*

The claim terms in the '364 patent should be given their ordinary and

customary meaning, as those terms would have been known to a person of ordinary

skill in the art at the time of the invention. *Phillips v. AWH Corporation*, 415 F.3d

1303, 1312-1313 (Fed. Cir. 2005) (en banc) (citations omitted), *cert. denied*, ___ U.S.

___, 126 S. Ct. 1332 (2006). Thus, the claims should be construed in this case as

they would have been understood by one knowledgeable in the garment industry in

December 1989.

> It is the person of ordinary skill in the field of the
> invention through whose eyes the claims are construed.
> Such person is deemed to read the words used in the
> patent documents with an understanding of their meaning
> in the field, and to have knowledge of any special meaning
> and usage in the field. The inventor's words that are used
> to describe the invention -- the inventor's lexicography --
> must be understood and interpreted by the court as they
> would be understood and interpreted by a person in that
> field of technology. Thus the court starts the decision-
> making process by reviewing the same resources as would
> that person, *viz.*, the patent specification and the
> prosecution history.

*Id.* at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Limited*, 133 F.3d 1473,

1477 (Fed. Cir. 1998)).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. The patent specification provides additional guidance as to the meaning of the claims. *Id.* at 1315 ("claims 'must be read in view of the specification.'") (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)). In addition, "a court 'should also consider the patent's prosecution history, if it is in evidence.'" *Id.* at 1317 (quoting *Markman*, 52 F.3d at 980).

Claims should also be construed, where possible, not to read on the prior art, and thus to preserve validity. See *Harris Corporation v. IXYS Corporation*, 114 F.3d 1149, 1153 (Fed. Cir. 1997); *Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning."). However, "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Rhine v. Casio, Incorporated*, 183 F.3d 1342, 1345 (Fed. Cir. 1999).

Finally, specific disclaimers by the patentee during prosecution of a patent further limit its scope. See *Omega Engineering, Inc. v. Raytek Corporation*, 334 F.3d

1314, 1324 (Fed. Cir. 2003).  "As a basic principle of claim interpretation,

prosecution disclaimer promotes the public notice function of the intrinsic evidence

and protects the public's reliance on definitive statements made during prosecution."

*Id.*; see also *Standard Oil Company v. American Cyanamid Company*, 774 F.2d 448, 452

(Fed. Cir. 1985) ("the prosecution history (or file wrapper) limits the interpretation

of claims so as to exclude any interpretation that may have been disclaimed or

disavowed during prosecution in order to obtain claim allowance").

### 2. *Infringement Standards*

As mentioned above, to prove infringement, the patentee must show that the

accused device meets each claim limitation, either literally or under the doctrine of

equivalents ("DOE").  *Playtex*, 400 F.3d at 906.  Liability for infringement of a patent

also lies with those who induce the infringement of a patent.

### a. Direct, Literal Infringement

To prove literal infringement, "the patentee must show that the accused devise

contains every limitation in the asserted claims."  *Mas-Hamilton Group v. LaGard, Inc.*,

156 F.3d 1206, 1211 (Fed. Cir. 1998).  "If even one limitation is missing or not met

as claimed, there is no literal infringement."  *Id.*

### b. Doctrine of Equivalents Infringement

To prove infringement under the DOE, every element of a patent claim must

be considered separately and given effect.  "Each element contained in a patent claim

is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997). The doctrine of equivalents does not permit "a patent claim to encompass subject matter that could not have been patented; nor can it be used to ignore the actual language of the patent. Thus, we have held that the doctrine of equivalents cannot allow a patent to encompass subject matter existing in the prior art." *K-2 Corporation v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed. Cir. 1990); see also *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1366-67 (Fed. Cir. 2002) ("the scope of equivalents may not extend so far as to ensnare prior art.").

The doctrine of equivalents cannot be applied to read any element of a claim out of existence. *Warner-Jenkinson*, 520 U.S. at 29. A court may not use the doctrine of equivalents to erase structural or functional limitations of a claim, since the public is entitled to rely on those limitations in avoiding infringement. *Perkin-Elmer Corporation v. Westinghouse Electric Corporation*, 822 F.2d 1528, 1532 (Fed. Cir. 1987). Summary judgment for the accused infringer is appropriate if use of the doctrine of equivalents would erase a claim limitation: "if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve." *Warner-*

*Jenkinson*, 520 U.S. at 39 n.8 (emphasis in original).  This rule is known as the "all elements" rule.

A corollary to the all elements rule is the "specific exclusion" principle, under which a structure that is specifically excluded by the claim language cannot be recaptured by the doctrine of equivalents.  *Asyst Technologies, Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005).

When alleging infringement under the DOE, the patentee must show that for each claim element that is not literally found in the accused device, the alleged equivalent "matches the function, way, and result of the claimed element." *Warner-Jenkinson*, 520 U.S. at 40.  Otherwise, no infringement can be found.  See *id.*  Failure to give effect to even one limitation is reversible error.  *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 398-99 (Fed. Cir. 1994).

In addition, "the [p]atentee may not use the [DOE] to recover subject matter that has been surrendered.  For example, prosecution history estoppel will exclude from the doctrine of equivalents any subject matter that was, by amendment or argument during prosecution, relinquished." *K-2 Corporation*, 191 F.3d at 1367 (citing *Warner Jenkinson*, 520 U.S. at 30-31); see also *Cybor Corporation*, 138 F.3d at 1460.  Under the DOE, there is a presumption that an amendment is made for purposes of patentability, and that all the subject matter between the broader language of the original claim and the narrower language of the amended claim has

been surrendered.  The patentee bears the burden of showing that the amendment

did not surrender the particular equivalent in question.  See *Festo Corporation v.*

*Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740-741 (2002).

### c.  Induced Infringement

Liability for infringement of a patent lies not only with direct infringers, but

also with those who induce the infringement of a patent.  35 U.S.C. § 271(b).  To

establish inducement, a patentee must show two things:  (1) that there has been a

direct infringement; and (2) that the party accused of inducement knowingly and

intentionally encouraged that direct infringement.  *Minnesota Mining & Manufacturing*

*Company v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002), *cert. dismissed*,

538 U.S. 972 (2003).  Direct evidence of inducement is not necessary, as

circumstantial evidence is not only sufficient -- "'but may also be more certain,

satisfying, and persuasive than direct evidence.'"  *Moleculon Research Corporation v.*

*CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) (citation omitted), *cert. denied*, 479

U.S. 1030 (1987).

### d.  Independent and Dependent Claims

There are two types of claims in a patent: independent claims and dependent

claims.  Each independent claim stands alone.  A dependent claim "depends" on an

independent claim and includes all of the limitations of the associated independent

claim, as well as its own additional limitations.  A product or process that does not

infringe an independent claim, either literally or under the DOE, cannot infringe any claim dependent on that independent claim. *Wahpeton Canvas Company, Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

### C.   Scope and Meaning of the '364 Patent

Many of the concepts used in the '364 patent were well known in the prior art. Indeed, during prosecution of the application that led to the '364 patent, the Patent Office cited a number of prior art references.  Many of these references disclosed structures similar to what is claimed in the '364 patent application, and therefore this court will construe the claims in the '364 patent in light of the prior art, as well as the patentee's amendments and arguments in response to the prior art rejections.

The '364 patent contains nine claims.  Claim one is an independent claim, and claims two through six are dependent upon claim one.  Claim seven is an independent claim, and claims eight and nine are dependent upon claim seven.  Accordingly, a court should examine the independent claims first, and if an infringement of those claims is found, then examination of the dependent claims is necessary.  However, if there is a finding of non-infringement of the independent claims, there can likewise be no infringement of the dependent claims. *Id.*  Therefore, the court will first determine the scope and meaning of claims one and seven.

#### 1.  *Claim One*

As issued, claim one reads as follows:

1.  A garment crotch structure comprising:

A.  a right garment piece having a right leg opening, a first crotch portion adjacent to the right leg opening, and a first connecting section extending upwardly front and rear from the first crotch portion to both sides of the garment in the garment waist area, the first connecting section having a left edge that extends from the first crotch portion upwardly both front and rear to the left side waist area of the garment;

B.  a left garment piece having a left leg opening, a second crotch portion adjacent to the left leg opening , and a second connecting section extending upwardly front and rear from the second crotch portion to both sides of the garment in the garment waist area, the second connecting section having a right edge that extends from the second crotch portion upwardly both front and rear to the right side waist area of the garment; and

C.  the right garment piece and the left garment piece being connected together only in the waist area of the garment with the first and second crotch portions being overlapped across substantially the entire crotch area of the garment, and with the left edge of the right garment piece and the right edge of the left garment piece both being free along substantially their entire length and being connected to the opposite garment piece only in the garment waist area at the left side and right side of the garment, respectively, so that the first and second crotch portions may be parted manually by the wearer to form a crotch opening.

Several amendments were made to claim one in Orr's original application before the '364 patent was issued. Claim one of the original application for the '364 patent was amended in the following manner to reach the language that was issued:

(1)     Element C was amended from "first and second crotch portions being overlapped in the garment crotch area" to read "first and second crotch portions being overlapped across substantially the entire crotch area of the garment"; and

(2)     Element C was amended from "connected to the opposite garment piece only in the garment waist area" to read "connected to the opposite garment piece only in the garment waist area at the left side and right side of the garment, respectively."

The prosecution history shows that these amendments were made, along with substantial argument from the patent applicant, in response to the Patent Office's rejection of the original application for the '364 patent. *See* Amendment A to Application No. 455,306 submitted to the United States Patent and Trademark Office on July 25, 1990 (attached to Defendants' Appendix at 50-63). In its office action, the Patent Office stated, quoting from 35 U.S.C. § 102,[3] that claim one was rejected because it was clearly anticipated by prior art. Office Action mailed by the United States Patent and Trademark Office on April 27, 1990, ¶ 3 (attached to Defendants' Appendix at 42-29). Specifically, the office stated that the '364 patent,

---

[3]     35 U.S.C. § 102 states: "A person shall be entitled to a patent unless: . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

as originally applied for, was clearly anticipated by the Hatch patent and the Santoni patent.

For the court to determine whether any of Patagonia's products infringe upon claim one of the '364 patent, the court must construe the following terms or phrases: (1) "waist area" or "waist area of the garment"; (2) "across substantially the entire crotch area"; (3) "free along substantially their entire length."  As mentioned above, the court will construe the meaning of these terms based on the '364 patent specification, examination of prior art, the file history, and statements made by the patentee during prosecution of the '364 patent.

a. <u>"waist area" or "waist area of the garment"</u>

The terms "waist area" and "waist area of the garment" are construed by the court to mean an area of the garment that is above and distinct from the hip area of the garment.  To rule otherwise would conflict with Orr's definition given in both the patent specification and during prosecution of the '364 patent; more importantly, to interpret the terms "waist area" and "waist area of the garment"  in any other way would ensnare prior art -- the Santoni patent -- and thus invalidate the '364 patent.

This term was defined both in the patent specification, and by the patentee during prosecution.  The '364 patent states, "The two garment pieces 16 and 18 are connected together generally only at the waist area of the garment preferably about the waistline 58. . . ."  '364 patent at col. 4, lines 44-48.  As shown in Fig. 1 on the

'364 patent, the waistline 58 is the uppermost portion of the garment, about the

waist.  In Fig. 4 of the '364 patent, the "waist area" is specifically marked as 74, again

referring to the top of the garment and what might be considered the waistband.  *See*

'364 patent at col. 5 lines 18-21.

Moreover, during prosecution of the '364 patent, the patentee distinguished

the Santoni reference on the grounds that are even more telling.  The patentee

distinguished the Santoni reference on the grounds that "the slots 8 and 9 shown in

the Santoni reference particularly in Figure 3 extend only from the leg of the garment

to the sides of the garment substantially below the garment waist defined by the

waistband 4."  *See* Amendment A at 11, Defendants' Appendix at 60.  In making this

statement, Orr defined what the court will call the "hip area" of the garment.  This is

an area near the upper leg and to the sides of the garment where the crotch sections

attached to one another in the Santoni patent.

In distinguishing the Santoni patent, the patentee defined the "garment waist

area" as a distinct area, separate from the hip area of the garment.  Therefore, the

terms "waist area" and "waist area of the garment" are construed by this court in such

a way as to distinguish them from the hip area of the garment.  To interpret the terms

"waist area" and "waist area of the garment"  in any other way would ensnare prior

art -- Santoni -- and thus invalidate the '364 patent.  See *Tate Access Floors, Inc.*, 279

F.3d at 1366-67.

The Santoni patent, issued in 1971, disclosed a type of ladies tights with overlapping crotch portions and an openable crotch structure.[4]  During prosecution, the patent office initially rejected claim 1of the '364 patent because it was "'clearly anticipated' by Santoni."  Office Action mailed by the US Patent and Trademark office on April 27, 1990, ¶ 3.  The similarities between Santoni and the '364 patent are shown below (below to the left is an excerpt of Figs. 1 and 3 of the '364 patent, and below to the right is an excerpt of Figs. 3 and 4 of the prior art Santoni).



In response to the Patent Office's rejection of the original '364 patent application (which explained that claim one was clearly anticipated by Santoni), Orr distinguished Santoni by arguing that the "slots 8 and 9 shown in the Santoni

---

[4]      The Patent Office cited the Santoni German patent DE 2038063. Although no translation was provided, it appears that the abstract of an English equivalent of the patent, GB 1311734, is in the record.  *See* Defendants' Appendix at 86-101.

reference particularly in Figure 3 extend only from the leg of the garment to the sides of the garment substantially below the garment waist defined by the waistband 4." Amendment A at 11, Defendants' Appendix at 60.  The "slots" are the leg openings 8 and 9 identified in the Santoni Figures 3 and 4 above.  As can be seen from Figures 3 and 4 above, the slots 8 and 9 are attached at an area near the top of the leg or hip. Therefore, slots that do not extend above the hip area of the garment into the waist area are not covered by the claim one limitations of the '364 patent.

### b.  "across substantially the entire crotch area"

This term was not defined in the '364 patent specification, but the term was defined by Orr in her argument distinguishing the prior art, namely, the Hatch patent and the Graham patent.  In distinguishing the prior art, the term "across substantially the entire crotch area" in the '364 patent must be construed to mean "a triangular area, similar in size and shape to the connecting sections 30 and 48 in Figs. 1 and 2." *See* Amendment A at 9-10, Defendants' Appendix at 58-59.

### c.  "free along substantially their entire length"

This term was not defined in the '364 patent specification, but the term was defined by Orr in her argument in support of Amendment A distinguishing prior art, namely, the Santoni patent, the Graham patent, and the Lawson patent.  Specifically, Orr stated that the "connection **only** in the waist area at the side of the garment is vital to the function of the invention."  Amendment A at 4, Defendants' Appendix at

53 (emphasis added).  This language allowed Orr to successfully distinguish the Graham and the Lawson patents.

The Graham patent included stitching that connected the crotch opening in the crotch area between the legs.  Likewise, the Lawson patent had a button that connected the crotch opening in the crotch area between the legs.  As a result, the Graham and Lawson patents feature garments that have free edges in the front and in the rear but are connected by stitching or a button in the crotch area between the legs.  Orr successfully distinguished the '364 patent by explaining that edges in the '364 patent were different because they are free along substantially their entire length.  Amendment A at 11-12, Defendants' Appendix at 60-61.

In addition, when distinguishing the '364 patent from the Graham and Lawson patents, Orr specifically narrowed the '364 patent's scope to exclude all garments that include crotch structures with mechanical closure devices.  Orr stated, "[r]ather than simply an openable crotch structure, the Applicant claims a specific garment crotch structure that is adapted to remain closed in normal use and even during strenuous exercise, but still allows manual opening without having to remove the garment and **without having to use mechanical enclosure devices such as zippers or . . . buttons.**"  Amendment A at 13, Defendants' Appendix at 62 (emphasis added).

The court construes the term "free along substantially their entire length" to mean that the edges are not connected to the garment along their length except in the

- 18 -

waist area of the garment in the front and in the rear at or near the sides of the

garment.

2. *Claim Seven*

As issued, claim seven reads as follows:

> 7.  A method of retaining an openable garment crotch
> closed in normal use where the garment crotch is
> comprised of first and second overlapping crotch portions,
> said method comprising the steps of:
>
>> A.  connecting the first garment crotch
>> portion between a right leg opeining [sic] and
>> the left side of the garment in the waist area
>> thereof so as to form a first free edge of
>> material extending from the first crotch
>> portion front and rear substantially to the
>> waist area at the left side of the garment; and
>>
>> B.  connecting the second garment crotch
>> portion between a left leg opening and the
>> right side of the garment in the waist area
>> thereof so as to form a second free edge of
>> material extending from the second crotch
>> portion front and rear substantially to the
>> waist area at the right side of the garment,
>> whereby the first and second free edges may
>> be parted manually to separate the first and
>> second crotch portions to form a crotch
>> opening.

Several amendments were made to claim seven in Orr's original application

before the '364 patent was issued.  Claim seven of the original application for the

'364 patent was amended in the following manner to reach the language that was

issued:

(1)     Element A was amended from "substantially to the waist area of the garment" to read "substantially to the waist area at the left side of the garment"; and

(2)     Element B was amended from "substantially to the waist area of the garment" to read "substantially to the waist area at the right side of the garment."

The prosecution history shows that these amendments were made, along with substantial argument from Orr, in response to the Patent Office's rejection of the original application for the '364 patent.  *See* Amendment A at 3, Defendants' Appendix at 52.  In its office action, the Patent Office quoted from 35 U.S.C. § 103[5] and concluded that claim seven was

> "unpatentable over Graham in view of Lawson, Hatch and Santoni.  Either of the two secondary references teach the crotch structure or two piece garments as disclosed.  The same include first and second crotch pieces, right and left edges and the attachment of both pieces to the waist portion in such a manner to provide a crotch opening.  These references also show that this structure has been

---

[5]     35 U.S.C. § 103 states:  "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person."

- 20 -

known in undergarments, pantyhose and body garments; leotards are considered to be included in the latter.

The reference to Graham does show the overlapping crotch portions and connecting sections, but the same does not show the attachment to the waist portion. This dividing line between the upper and lower garment is known in the art of body garments as shown by Lawson, who also includes the overlapping portions. The degree of overlap shown in the drawings is taught by Hatch and Santoni.

It would have been obvious to modify the garment to Graham by including the waistband member and the crotch portion and sections attached thereto because openable crotch member garments have been known to be fashioned as disclosed by the secondary references.

Office Action at 3-4, Defendants' Appendix at 44-45.

In summary, the Patent Office stated that the '364 patent, as originally applied for, was unpatentable over Graham in view of Lawson, Hatch and Santoni. It stated that either of the two secondary references teach the crotch structure or two piece garments as disclosed.

For the court to determine whether any of Patagonia's products infringe claim seven of the '364 patent, the court must construe the following terms or phrases: (1) "overlapping crotch portions"; (2) "waist area"; and (3) "free edge of material". As mentioned above, the court will construe the meaning of these terms based on the '364 patent specification, examination of prior art, the file history, and statements made by the patentee during prosecution of the '364 patent.

### a.  "overlapping crotch portions"

The court construes the phrase "overlapping crotch portions" as used in claim seven to mean "a triangular area, similar in size and shape to the connecting sections 30 and 48 in Fig. 1 and 2."  This phrase has the same meaning as "across substantially the entire crotch area" above.

### b.  "waist area"

As mentioned above, and for the same reasons, the court construes the term "waist area," as it is used in claim seven, to mean an area of the garment that is above and distinct from the hip area of the garment.

### c.  "free edge of material"

The court construes the term "free edge of material" to mean that the material that has a free edge is not connected to anything -- *i.e.*, there is no closure mechanism similar to the stitching used in Graham or the button used in Lawson.  Accordingly, any of the defendants' garments that has a closure mechanism will be outside the '364 patent's limitations because such a garment will not have a first or second "free edge of material extending from the first [or second] crotch portion front and rear substantially to the waist area at the left [or right] side of the garment."  Claim seven, Defendants' Appendix at 10.  To interpret this term in any other manner would read on prior art -- Graham and Lawson -- and therefore invalidate the '364 patent.  See *Harris Corporation*, 114 F.3d at 1153.

- 22 -

D.  Application of the Properly Construed Claims to Patagonia's Products

Orr alleges that the following Patagonia products infringe the '364 patent: (1) Men's R1 SuperFly pants; (2) Women's R1 SuperFly pants; (3) Men's R.5 SuperFly tights; (4) Women's R.5 SuperFly tights; (5) Men's Stretch Capilene SuperFly tights; (6) Women's Stretch Capilene SuperFly tights; (7) Activist Suit; (8) Six Chuter Bibs; (9) Ice Nine bibs; (10) Ice Nine Suit; (11) Men's Stretch Element Pants; (12) Women's Stretch Element Pants; (13) Women's Mixmistress Pants; and (14) Women's White Smoke Pants.  Plaintiff's Interrogatory Response, Defendants' Appendix at 125-26.  Products one through six feature the Patagonia "SuperFly" ("the superfly products").  Items seven through fourteen are all Patagonia products that feature the "Bombay Fly" ("bombay fly products").  Orr asserts that, in Patagonia's sales and promotion of its bombay fly products, Patagonia knowingly and intentionally encouraged the sale and use of its infringing Superfly products. Accordingly, Orr argues, any product incorporating the bombay fly feature induces infringement of the '364 patent.

Because there can be no infringement by inducement without direct infringement, the court will first examine the six superfly products.  If the court finds infringement by any of the superfly products, then the court will address the bombay fly products' alleged infringement; otherwise, inquiry into the bombay fly products will not be necessary.

- 23 -

1.  *Men's and Women's R1 Superfly Pants*[6]

The current design of the SuperFly pants were introduced in 2005 and are called the R1 SuperFly.  Brief in Support of Defendants' Motion for Summary Judgment of Noninfringement ("Motion") at 20.  Below is a diagram obtained from the Patagonia R1 Construction Specifications:



Diagram of the front (left) and rear (right) of the Men's and Women's R1SuperFly Pants.

This design utilizes a through-the-crotch zipper.  *See* Patagonia, Inc. construction specifications for Men's and Women's R1 SuperFly Pants, *attached to* Defendants' Appendix at 102-07 ("R1 SuperFly Specifications").  The R1 pants do not have a crotch portion that overlaps; rather, they are attached with a zipper.

---

[6]    Because the structure of the men's and women's R1 SuperFly pants are substantially similar, the court will address them together.

a.  <u>Claim One</u>

Claim one describes a garment crotch structure that includes the following:
(1) separate right and left garment pieces that are connected only in the waist area;
(2) first and second crotch portions overlapped across substantially the entire crotch
area; and (3) the left edge of the right garment piece and the right edge of the left
garment piece are substantially free along their entire lengths.  Because the Men's and
Women's R1 SuperFly Tights do not have crotch portions overlapping the crotch area
and because they include a zipper that prevents the crotch pieces from being
substantially free along their entire lengths, they do not infringe claim 1 of the '364
patent.  Moreover, Orr specifically excluded garments that utilize closure devices like
zippers when prosecuting the '364 patent.  Amendment A at 13, Defendants'
Appendix at 62; *Rhine*, 183 F.3d at 1345.

b.  <u>Claim Seven</u>

Claim seven describes a garment with an openable crotch structure with
overlapping crotch portions that include free edges along the crotch portions from the
front waist area to the back waist area.  Because the Men's and Women's R1
SuperFly Tights do not have crotch portions overlapping the crotch area and because
they include a zipper that prevents the crotch pieces from being free along their edges
from the front waist area to the back waist area, they do not infringe claim seven of
the '364 patent.  As noted above, Orr specifically excluded garments that utilize

closure devices like zippers when prosecuting the '364 patent.  Amendment A at 13,

Defendants' Appendix at 62; *Rhine*, 183 F.3d at 1345.

### 2.  *Men's and Women's Stretch Capilene SuperFly Tights*[7]

The Men's and Women's Stretch Capilene SuperFly Tights were introduced

around 1998.  Motion at 23.  The men's and women's designs both included separate

front and rear crotch openings.  The front and rear openings were created by

overlapping sections of fabric in the center of the front and rear of the tights.  The

crotch area below and between the front and rear openings is comprised of a solid

section of fabric that cannot be parted to create a crotch opening.  Furthermore, as

shown in the diagram below, the overlapping pieces of fabric used to create the front

and rear openings were centered in the front and rear crotch areas and did not extend

across substantially the entire crotch area.



Diagram of Men's (left) and Women's (right) Stretch Capilene SuperFly Tights
from the front (left) and rear (right).

---

[7]      Because the structure of the men's and women's Capilene SuperFly
Tights are substantially similar, the court will address them together.

Defendants' Appendix at 108-113.

### a. Claim One

Claim one describes a garment crotch structure that includes the following: (1) separate right and left garment pieces that are connected only in the waist area; (2) first and second crotch portions overlapped across substantially the entire crotch area; and (3) the left edge of the right garment piece and the right edge of the left garment piece are substantially free along their entire lengths. Because the Men's and Women's Stretch Capilene SuperFly Tights do not include separate left and right garment pieces connected only in the waist area, first and second crotch portions that overlap across substantially the entire crotch area, or left and right edges of the garment pieces that are substantially free along their entire lengths, they do not infringe claim one of the '364 patent.

### b. Claim Seven

Claim seven describes a garment with an openable crotch structure with overlapping crotch portions that include free edges along the crotch portions from the front waist area to the back waist area. The Men's and Women's Stretch Capilene SuperFly Tights do not include overlapping crotch portions with free edges along the crotch portions from the front waist area to the back waist area; the edges are stitched together in the central crotch area to create a closure. Thus, they do not infringe claim seven of the '364 patent.

### 3. *Men's R.5 SuperFly Tights*

The Men's R.5 SuperFly Tights were introduced by Patagonia around 2001. Motion at 28.  Like the Men's and Women's Stretch Capilene SuperFly Tights, the Men's R.5 SuperFly Tights include separate front and rear crotch openings.  The front and rear openings were created by overlapping sections of fabric in the center of the front and rear of the tights.  The crotch area below and between the front and rear openings was comprised of a solid section of fabric that could not be parted to create a crotch opening.  Furthermore, as shown in the diagram below, the overlapping pieces of fabric used to create the front and rear openings were centered in the front and rear crotch areas and did not extend across substantially the entire crotch area.

 

Diagram of Men's R.5 SuperFly Tights from the front (left) and rear (right).

Defendants' Appendix at 115-117.

### a. Claim One

Claim one describes a garment crotch structure that includes the following:

(1) separate right and left garment pieces that are connected only in the waist area;

(2) first and second crotch portions overlapped across substantially the entire crotch area; and (3) the left edge of the right garment piece and the right edge of the left garment piece are substantially free along their entire lengths.  Because the Men's R.5 SuperFly Tights did not include separate left and right garment pieces connected only in the waist area, first and second crotch portions that overlapped across substantially the entire crotch area, or left and right edges of the garment pieces that were substantially free along their entire lengths, they do not infringe claim one of the '364 patent.

### b.  Claim Seven

Claim seven describes a garment with an openable crotch structure with overlapping crotch portions that include free edges along the crotch portions from the front waist area to the back waist area.  Because the Men's R.5 SuperFly Tights do not include overlapping crotch portions with free edges along the crotch portions from the front waist area to the back waist area, they do not infringe claim seven of the '364 patent.

### 4.  *Women's R.5 SuperFly Tights*

The Women's R.5 SuperFly Tights were also introduced by Patagonia around 2001.  Motion at 31.  The edges of the crotch structure are free along substantially their entire length from the front side waist area to the back side waist area.  The edges of the crotch structure contain no mechanical closure devices or stitching to

bind them together, and the separate right and left garment pieces are only attached

to one another in the waist area (at the waistband) of the tights.  Furthermore, as

shown in the diagram below, the openable crotch structure is created by separate right

and left crotch portions overlapped across substantially the entire crotch area.



Diagram of Women's R.5 SuperFly Tights from the front (left) and rear (right).

Defendants' Appendix at 118-120.

### a.  <u>Claim One</u>

Claim one describes a garment crotch structure that includes the following:

(1) separate right and left garment pieces that are connected only in the waist area;

(2) first and second crotch portions overlapped across substantially the entire crotch

area; and (3) the left edge of the right garment piece and the right edge of the left

garment piece are substantially free along their entire lengths.  Because the Women's

R.5 SuperFly Tights include separate left and right garment pieces connected only in

the waist area, first and second crotch portions that overlap across substantially the

entire crotch area, and the left and right edges of the garment pieces are substantially

free along their entire lengths, defendants have failed to show that the tights do not directly infringe claim one of the '364 patent.[8]

Because the defendants have failed to prove the Women's R.5 SuperFly Tights do not infringe claim one, the court will now consider whether they infringe claims two, three, and five.

b. Claim Two

Claim two states:

> The garment crotch structure of claim 1 wherein the right garment piece and the left garment piece are connected together by suitable means along substantially the entire waistline of the garment.

For the purposes of analyzing this claim, the court will assume the Women's R.5 SuperFly Tights contain the crotch structure described in claim one. Consequently, because the right and left garment pieces are connected along the entire waistline of the tights, the defendants have failed to prove that the Women's R.5 SuperFly Tights do not directly infringe claim two of the '364 patent.

c. Claim Three

Claim three states:

> The garment crotch structure of claim 1 including:

---

[8]     In her response to defendants' motion for summary judgment (since stricken), Orr argues that the Women's R.5 SuperFly Tights infringe claims two, three, and five of the patent, which are dependent upon claim one. *See* Plaintiff's Response Brief at 11.

A.  right edge reinforcing means for reinforcing the connection between the right edge of the left garment piece front and rear, and the right garment piece in generally the waist area of the garment; and

B.  left edge reinforcing means for reinforcing the connection between the left edge of the right garment piece both front and rear, and the left garment piece in generally the waist area of the garment.

In order to interpret this claim, the court must define the phrase "reinforcing means for reinforcing the connection."  Based on the context in which the phrase is used and the description of "reinforcing stitching" used in the patent and shown at 60 in figure 1 of the '364 patent, the court interprets the phrase to mean "stitching used to connect the separate right and left garment pieces together."

For the purpose of analyzing this claim, the court will again assume the Women's R.5 SuperFly Tights contain the crotch structure described in claim one. Even so, they do not contain right or left edge reinforcing means for reinforcing the connection between the right and left garment pieces on the left and right side, respectively.  In fact, an examination of the Women's R.5 SuperFly Tights reveals that the right and left garment pieces are only connected together along the waistline of the tights at the waistband and not in any other area of the garment, including the left and right sides of the right and left garment pieces, respectively.  Therefore, the Women's R.5 SuperFly Tights do not infringe claim three of the '364 patent.

d. <u>Claim Five</u>

Claim five states:

> The garment crotch structure of claim 3 wherein the
> garment crotch structure is incorporated into a pair of
> pantyhose or the like terminating upwardly at a waistband
> along which the right and left garment pieces are connected
> together and having garment legs extending from both the
> right and left leg openings.

As noted above, the Women's R.5 SuperFly Tights do not contain the garment

crotch structure outlined in claim three.  In addition, the Women's R.5 SuperFly

Tights do not include a crotch structure incorporating "a pair of pantyhose or the

like."  Accordingly, the Women's R.5 SuperFly Tights do not infringe claim five of

the '364 patent.

e. <u>Claim Seven</u>

Claim seven describes a garment with an openable crotch structure with

overlapping crotch portions that include free edges along the crotch portions from the

front waist area to the back waist area.  Because the Women's R.5 SuperFly Tights

include overlapping crotch portions with free edges along the crotch portions from the

front waist area to the back waist area, the defendants have not sustained their

summary judgment burden of showing that the Women's R.5 SuperFly Tights do not

directly claim seven of the '364 patent.[9]

_____

[9]      In her stricken response to defendants' motion for summary judgment,
Orr argues the Women's R.5 SuperFly Tights infringe claims eight and nine of the

(continued...)

- 33 -

Because the defendants have failed to prove that the Women's R.5 SuperFly Tights do not infringe claim seven, the court will now consider whether they infringe claims eight and nine.

### f.  Claim Eight

Claim eight states:

> The method of claim 7 wherein the first and second garment crotch portions each have a connecting section extending upwardly both front and rear to the waist area of the garment at both sides thereof and the step of connecting the first and second garment crotch portions includes connecting the two connecting sections at the waist of the garment.

For the purpose of analyzing this claim, the court will assume the Women's R.5 SuperFly Tights contain the method of claim seven.  Moreover, the left and right garment pieces have sections that extend upwardly in the front and rear of the tights in order to connect the two garment pieces at the waistline.  Thus, the defendants have failed to prove that the Women's R.5 SuperFly Tights do not directly infringe claim eight of the '364 patent.

### g.  Claim Nine

Claim nine states:

> The method of claim 7 wherein:

_____

[9](...continued)
patent, which are dependent upon claim seven.  *See* Plaintiff's Response Brief at 11.

> A.  the step of connecting the first garment
> crotch portion includes reinforcing the end of
> the first free edge in the waist area; and
>
> B.  the step of connecting the second garment
> crotch portion includes reinforcing the end of
> the second free edge in the waist area.

In order to interpret this claim, the court must define the phrase "reinforcing the end" of the free edges.  Based on the context in which the phrase is used and the description of "reinforcing stitching" used in the patent and shown at 60 in figure 1 and 96 in figure 4 of the '364 patent, the court interprets the phrase to mean "stitching used to connect the separate right and left garment pieces together."

For the purpose of analyzing this claim, the court will again assume the Women's R.5 SuperFly Tights contain the method of claim seven.  Because the right and left edges of the garment pieces of the Women's R.5 SuperFly Tights are connected together in the waist area at the waistband of the tights in a manner similar to that described in claim nine, the defendants have not met their burden of proving that the Women's R.5 SuperFly Tights do not directly infringe claim nine of the '364 patent.

5.  *The Bombay Fly Products*

Orr asserts that, in Patagonia's sales and promotion of its bombay fly products, Patagonia knowingly and intentionally encouraged the sale and use of its infringing

Superfly products.  Accordingly, Orr argues, any product incorporating the bombay fly feature is also liable for infringement of the '364 patent.

In its motion for summary judgment, defendants have provided no evidence that the Bombay Fly products were not sold or marketed in conjunction with the Women's R.5 SuperFly Tights in order to induce infringement of that product.  To the contrary, Patagonia admits that the bombay fly products "can be used with the accused SuperFly products."  Motion at 39.  Though defendants also argue the bombay fly products can be used with non-infringing products, it has provided no summary judgment evidence to counter Orr's allegations that the bombay fly products induce infringement of the '364 patent by encouraging consumers to purchase the infringing Women's R.5 SuperFly Tights.

## III.  <u>CONCLUSION</u>

Based on the above findings and Orr's failure to properly file a response to Patagonia's motion for summary judgment, the court rules as follows:

With respect to the Men's and Women's R1 SuperFFly pants, the Men's and Women's Stretch Capilene SuperFly tights and the Men's R.5 SuperFly tights, the defendants' motion for a summary judgment of noninfringement is **GRANTED**.

With respect to the Women's R.5 SuperFly tights and all of the bombay fly products (the Activist Suit, Six Chuter Bibs, Ice Nine Bibs, Ice Nine Suit, Men's Stretch Element Pants, Women's Stretch Element Pants, Women's Mixmistress

Pants, and Women's White Smoke Pants), the defendants' motion for a summary judgment of noninfringement is **GRANTED** for claims three, four, five, and six of the '364 patent, but **DENIED** with respect to claims one, two, seven, eight, and nine of the '364 patent.

**SO ORDERED**.

September 26, 2006.

A. JOE FISH
CHIEF JUDGE